COMMONWEALTH *vs.* JAMES CHARLES MISKEL, JR.

Suffolk.    December 3, 1973. — March 14, 1974.

Present:   TAURO, C.J., REARDON, QUIRICO, HENNESSEY, & WILKINS, JJ.

*Practice, Criminal,* Assistance of counsel; Exceptions: failure to save exception; Capital case. *Constitutional Law,* Assistance of counsel. *Evidence,* Admitted without objection.

Where, while the jury was being empanelled in a murder case, the judge conducted a lengthy inquiry into a claim then made by the defendant of unsatisfactory representation by court appointed counsel regarding peremptory challenges, and the judge allowed the defendant late peremptory challenges of jurors already sworn but, within his discretion, refused to appoint new counsel, and where defence counsel conducted a competent defence demonstrating no "irreconcilable conflict" between the defendant and him, the defendant was not deprived of his right to effective counsel as guaranteed by the Sixth and Fourteenth Amendments to the Federal Constitution. [787-792]

Where the defendant in a murder case objected to a question by the prosecutor to a witness, "What prompted you to offer him [the defendant] the gun?", and saved an exception, but did not object to the prosecutor's next question, "What was the occasion for your giving him the gun" or to the answer thereto, the defendant could not rely on his exception to the ruling on the first question as a basis for a claim of error with reference to the second question or the answer thereto; and the answer to the second question, "I figured he wanted to use it," considered in the context of all of the witness's testimony, did not cause a "miscarriage of justice" under G. L. c. 278, § 33E. [792-793]

This court in its review under G. L. c. 278, § 33E, of a murder case, found no "miscarriage of justice" where the issue turned essentially on witness credibility and the jury had sufficient evidence before it to warrant its verdict of first degree murder. [794]

INDICTMENT found and returned in the Superior Court on December 14, 1970.

The case was tried before *Campbell,* J.

*Albert L. Hutton, Jr.,* for the defendant.

*Lawrence L. Cameron,* Assistant District Attorney (*Frances M. Burns,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

QUIRICO, J. The defendant was indicted for the crime of murder in the first degree of Dario Alberghini. After a trial held subject to G. L. c. 278, §§ 33A-33H, as amended, a jury found him guilty as charged and recommended that the sentence of death be not imposed. See G. L. c. 265, § 2, as appearing in St. 1951, c. 203.[1]

The case is before us on the defendant's appeal based on his assignment of two alleged errors by the trial judge, one relating to certain differences between the defendant and his trial counsel and the other to the admissibility of certain evidence. A third alleged error was expressly waived by the defendant in his brief. The appeal also transferred to this court "the whole case for . . . [our] consideration of the law and the evidence," as provided by G. L. c. 278, § 33E, as amended by St. 1962, c. 453.

We summarize the evidence to the extent necessary for the purpose of this opinion. Dario Alberghini was shot and killed early on the morning of October 8, 1970. A young woman (herein identified only as "Jean") testified as follows when called as a witness for the Commonwealth. She had worked as a prostitute since about January or February, 1970, turning over her earnings to the defendant. On the evening of October 7, 1970, she went to a bar off Washington Street in downtown Boston, arriving about 9 P.M. About 11 or 11:30 P.M. she called the defendant from a telephone booth nearby and told him that "it was 'hot' outside," meaning that there were "a lot of cops around" and that she was scared. The defendant told her to call a person who was known to both of them — herein identified only as "Linda" — and to ask Linda whether she, Jean, could use her apartment that evening in the event she found a customer in the course of her calling as a prostitute. Linda's apartment was at an address in Dorchester.

---

[1] The verdict was returned on June 30, 1971, thus preceding *Furman* v. *Georgia,* 408 U. S. 238, the decision of the United States Supreme Court of June 29, 1972, which bears on the constitutionality of statutes giving trial juries discretionary powers with relation to the imposition of death sentences.

Jean asked the defendant to meet her at Linda's apartment because she "had had trouble during that last week with different men." She then tried to call Linda but the line was busy. She returned to the bar and about 1:30 A.M. she met Dario Alberghini. They left the bar around 2 A.M. and drove together in his car to Linda's address in Dorchester. Jean entered the apartment building alone and rang Linda's doorbell several times but received no answer. Alberghini then came into the building hallway and asked her what was taking so long. She told him she was getting no answer. She then saw him pull out a knife which he held in his hand and she screamed. The defendant appeared outside the door of the building and attempted to get in, but Alberghini tried to keep him out. The defendant ultimately did gain entrance and told Alberghini to turn around. The latter refused and made a motion at the defendant with his knife. Jean could see the defendant's hands, and saw nothing in them. The defendant and Alberghini began to fight and Jean heard a shot. She ran out of the hallway and up the street. A few seconds later the defendant caught up with her. She asked him what happened and he replied that "[t]he gun went off." She asked him if the man was dead and he replied that he did not know. The two then walked to the defendant's mother's house near by. After arriving there she used a piece of tissue to wipe some blood off the defendant's right arm where he had been cut.

Alberghini's body was found between 5:30 A.M. and 6 A.M. on October 8, 1970, propped up in the hallway of the apartment building where Linda lived, with the left leg of his trousers ripped from the front pocket to the knee. The police arrived shortly after 6 A.M. When they lifted the victim's body to a stretcher, a pocket knife fell from his hand. The victim's wallet was later found in one of the trouser pockets, with $65 and various personal papers and cards in it.

Charles Moody testified as follows when called as a witness by the Commonwealth. He was at Linda's apartment on the night of October 7, and the defendant came there between 11:15 and 11:45 P.M. The defendant said something

about meeting "Jeannie" later. Moody offered the defendant his gun, a .22 caliber hand pistol, and the defendant accepted the offer. Moody wiped his fingerprints from the weapon, put it in a paper bag, gave it to the defendant, and the two men left the apartment together. Moody left the defendant across the street from the apartment building about midnight, and went on to visit another friend. Moody returned to Linda's apartment at 1:45 A.M. and about 2:30 or 2:45 A.M. he heard a loud noise from the side of the building at the front. Prior to hearing this noise he did not hear the door buzzer or bell ring in the apartment. Linda had previously testified that she was at home for the entire evening of October 7 and morning of October 8, and heard neither the doorbell nor the telephone ring during that time.

The defendant testified as follows. He obtained a gun from Charles Moody about midnight on the evening of October 7, and after he left Moody outside of Linda's apartment building he just walked around the area, thinking about Jean and "worrying about her" because of what she had said about her recent troubles with her "dates." At some point as he was walking by Linda's building and street he heard a scream. He ran to the door of the building. He could see Jean and a man in the hallway, and he struggled with the man at the door in order to gain entrance. Once inside, he and the man stood close to one another and faced each other, neither one moving or speaking. Jean was in the corner of the hallway. He then saw something in the man's hand which caught the light. After more staring, the two men began fighting and struggling with each other, the defendant knocking off the man's glasses in the process. The defendant had the paper bag with the gun in it in his right hand. He put his hand in the bag and held the trigger of the gun but never let the bag go. Then, as the two men were "tussling," very close together, the gun went off. The victim put up his hands and said, "Oh," and slid down against the wall. Jean passed behind the defendant and went out the door. After the victim fell the defendant did not move but just looked, feeling "shocked." He did not tear the victim's pants. They were in-

tact when he left the hallway. He then went out the door, "froze a little bit" and then proceeded up the street and caught up with Jean. She wiped blood off his arm where it had been cut. At the trial he showed to the judge and jury the knife wound he said he had received.

A biological chemist working for the Boston police department testified that he performed a benzidine test on the knife found in the victim's possession. The test indicated that no blood was on the knife. He also performed a Walker powder pattern test on the victim's sports jacket. This test indicated, in his opinion, that the fatal shot had been fired from more than five feet away.

The defendant assigns and argues as error (1) the refusal of the judge to permit him to discharge his court-appointed counsel during but prior to completion of the jury empanelment and (2) the admission in evidence of allegedly prejudicial opinion testimony elicited from the witness Moody by the assistant district attorney. The defendant argues further that if this court should decide there was no reversible error committed by the trial judge, it should nevertheless review the whole case under the powers conferred by G. L. c. 278, § 33E; and that considerations of justice and fairness require that it order the entry of a verdict of guilty of manslaughter and that the case be remanded to the Superior Court for the imposition of sentence. We discuss his arguments in order.

1. *Alleged Error in the Trial Court's Refusal to Discharge the Defendant's Counsel and to Appoint New Counsel.*

The defendant was arraigned on May 14, 1971, and his trial commenced on June 22, 1971. His trial counsel was Mr. David S. Nelson, who was appointed by a judge of the Superior Court on May 11, 1971, at the defendant's request. At the end of the first day twelve jurors had been empanelled, leaving only four alternate jurors to be selected. See G. L. c. 243, § 26B, as appearing in St. 1967, c. 285. At the opening of court the next morning, Mr. Nelson informed the judge that his client, the defendant, no longer wanted Mr. Nelson to represent him because the defendant believed Mr. Nelson

was lying to him and was incapable of representing his interests.

The judge thereupon conducted a lengthy and patient inquiry into the defendant's claim of unsatisfactory and "incompetent" representation. It appeared that the specific cause of the defendant's dissatisfaction was a "lie" purportedly told him by Mr. Nelson concerning the proper time to exercise peremptory challenges of prospective jurors: the defendant alleged that Mr. Nelson had first told him such challenges could be exercised after the whole jury panel was sworn, but had later informed him they could not. Mr. Nelson denied "lying" to the defendant but said there might have been a misunderstanding over the question of challenges. The defendant also alleged that Mr. Nelson had lied to him on other occasions but gave no specific information about any such other incidents. Nor did he name another attorney whom he would prefer to Mr. Nelson. After further discussion, primarily with the defendant, the judge ruled that he would not permit the defendant to dismiss Mr. Nelson and that he was not going to postpone the trial. He offered the defendant the choice of being represented by Mr. Nelson or of appearing pro se, with Mr. Nelson in the court room available to give any assistance that the defendant might request. In addition, to avoid any prejudice to the defendant's rights which might have resulted from his "misunderstanding" with Mr. Nelson about the exercise of peremptory challenges, the judge offered the defendant the opportunity to exercise his challenges late as to the jurors already sworn. The defendant, in consultation with Mr. Nelson, challenged six of those jurors.

At the opening of court the following day, June 24, the judge orally stated his findings in connection with his ruling on the defendant's request to discharge his counsel, which we summarize in part.

The judge found that Mr. Nelson had been appointed at the request of the defendant, had spent a substantial amount of time preparing the defence, and felt satisfied that he was prepared to go forward; that the case had been called for

trial and twelve jurors had been empanelled before the defendant first raised any objection concerning his counsel; that a special venire had been called for trial; and that all the Commonwealth witnesses were present, one of whom had been brought from out-of-State.

The judge also found that "the Defendant's efforts at this stage to discharge Mr. Nelson, his expressed desire not to proceed, and the sum total of his remarks and conduct suggest a purpose to use the issue of this alleged dissatisfaction with Mr. Nelson as a means of forestalling and preventing a trial. . . . The Court finds that Mr. Nelson is willing, able and well-prepared to represent the Defendant and that there is no sufficient reason why the trial should not proceed . . . . Delay or cessation of the trial at this stage would cost the public large sums of money in wasted effort and it is not clear that the Defendant would be better served or better represented at some future date by a different attorney than now."

The judge concluded that he felt it would be unfair to leave the defendant to proceed on his own in a trial with such potentially grave consequences, so that at least in the absence of a written waiver of counsel, which the defendant was unwilling to sign, Mr. Nelson would continue as the defendant's attorney but that the defendant could feel free to participate personally in the presentation of his own defence.

We hold that the judge's findings were warranted by the information which the defendant, Mr. Nelson and the assistant district attorney presented to him, and that his refusal to permit Mr. Nelson to withdraw as counsel was not error.

The defendant concedes that as an indigent he could not insist on the appointment of a particular attorney, see *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15-16 (2d Cir. 1965), cert. den. sub nom. *DiBlasi* v. *McMann,* 384 U. S. 1007 (1966), and he expressly rejects any contention that Mr. Nelson was either incompetent or ill prepared; rather he states that "because of the serious disputes which had developed between . . . [the defendant] and Mr. Nelson the attorney-client relationship had so deteriorated that it

was no longer possible for . . . [the defendant] to be the recipient of that kind of effective assistance of counsel to which he was entitled under the provisions of the Sixth and Fourteenth Amendments to the United States Constitution.'' This was precisely the issue before the single justice and then the full court in *Lamoureux* v. *Commonwealth,* 353 Mass. 556 (1968), and subsequently before the Federal Court of Appeals in *Lamoureux* v. *Commonwealth,* 412 F. 2d 710 (1st Cir. 1969).[2] In the latter case the court said, ''[A]n allegation of lack of rapport between counsel and client, in the absence of an allegation of ineffective assistance, does not rise to the level of a claim of deprivation of . . . right.'' 412 F. 2d at 712. We think this statement disposes of the contention the defendant raises before us here.

This case does not present the type of ''irreconcilable conflict'' between attorney and client which existed in *Brown* v. *Craven,* 424 F. 2d 1166 (9th Cir. 1970), on which the defendant relies. In that case, the record showed that the defendant refused to communicate at all with his court-appointed attorney so that the latter's presentation of a defence was perfunctory. In addition, the court in the *Brown* case found that the State trial judge had summarily denied the defendant's request for new counsel with no adequate inquiry into the causes of the defendant's dissatisfaction.

By contrast, the transcript in this case makes clear that, as noted, the judge went out of his way to conduct an extensive inquiry into the causes of the defendant's dissatisfaction with his counsel. It also reveals that before and after the judge's refusal to change counsel, the defendant and Mr. Nelson appeared to communicate closely and that Mr. Nelson represented the defendant throughout the trial itself, with the defendant sitting at his side in order to communicate more easily to the attorney his wishes about the conduct of the defence.[3] See *United States* v. *Morrissey,* 461 F. 2d 666, 669 (2d Cir. 1972).

---

[2] See *id.* at 711-712, fn. 1.

[3] Specifically, the record shows the following. Before the trial Mr. Nelson and the

It is now well established by decisions of this court and of the Federal courts that a defendant's freedom to change his counsel is restricted on the commencement of trial. "Once the trial had begun, the effectiveness of any right of the defendant to force a change of counsel was diminished. . . . [citations omitted]. Thereafter any prejudice to his interests was to be balanced with the foreseeable effect upon the trial already in progress. Upon this issue the decision must be largely within the discretion of the trial judge . . . [citations omitted]." *Lamoureux* v. *Commonwealth,* 353 Mass. 556, 560 (1968). *Lamoureux* v. *Commonwealth,* 412 F. 2d 710, 711 (1st Cir. 1969). See *Commonwealth* v. *Ransom,* 358 Mass. 580, 584-585 (1971); *Commonwealth* v. *Scott,* 360 Mass. 695, 698-701 (1971); *United States* v. *Calabro,* 467 F. 2d 973, 986 (2d Cir. 1972), and cases cited. In the present case the defendant first raised the question of his dissatisfaction with his attorney in the middle of the jury empanelment. While he tries to argue that his request for change of counsel was made therefore before the actual commencement of the jury trial, distinguishing his case from *Commonwealth* v. *Ransom, supra* (request for change of counsel made on second day of trial), and *Lamoureux* v. *Commonwealth, supra* (request made in the presence of the jury on second day of trial), we think such time distinctions are immaterial. The judge's finding that the trial proceedings were already well under way when the defendant first made his request is without dispute; his finding that the defendant was using his objection to Mr. Nelson's representation as a means of forestalling the trial is well supported by the record. In these circumstances the judge did not abuse his

defendant discussed the possibility of a plea and they conferred over possible challenges of prospective jurors. During the trial before the jury Mr. Nelson cross-examined almost every Commonwealth witness on behalf of the defendant; he presented and argued a motion for a directed verdict on behalf of the defendant at the close of the Commonwealth's case; and he called the defendant and his mother as defence witnesses. During recross-examination of one witness for the Commonwealth, the defendant had Mr. Nelson ask certain questions which he, the defendant, had framed himself and specifically wanted posed. Mr. Nelson also made the final argument to the jury for the defendant. Whatever conflict there might have been between the defendant and Mr. Nelson at one point in the proceedings, the record indicates that it did not affect the conduct of the trial as a whole.

discretion or otherwise commit error in denying the defendant's request to discharge Mr. Nelson as his counsel and to postpone the trial. See *Lamoureux* v. *Commonwealth,* 353 Mass. 556, 560 (1968); *Commonwealth* v. *Scott,* 360 Mass. 695, 699 (1971).

2. *Alleged Error in Admission of Evidence.*

We have noted above that the gun which was used in the killing of Dario Alberghini in the early morning hours of October 8, 1970, had been given to the defendant several hours earlier by Charles Moody at Linda's apartment. During his direct examination of Moody the prosecutor asked him, "What prompted you to offer him [the defendant] the gun?" The defendant's objection to the question was overruled and he saved an exception. The witness did not answer the question. The prosecutor instead put the following question, "What was the occasion for your giving him the gun, this .22?" to which the witness answered, "I figured he wanted to use it." The defendant did not object to the second question, nor did he object to its answer or move to strike it. He now contends that the question was not a proper one and that the answer was not responsive and was prejudicial, and he attempts to rely on his exception to the ruling on the first question as the basis for a claim of error with reference to the second question and the answer thereto. We hold that such reliance is improper.

"The saving of an exception is . . . essential to an appeal under G. L. c. 278, §§ 33A-33G. An assignment of error under § 33D not based on an exception brings nothing to this court for review." *Commonwealth* v. *Underwood,* 358 Mass. 506, 509, fn. 2 (1970), and cases cited. *Commonwealth* v. *Myers,* 356 Mass. 343, 346 (1969). *Commonwealth* v. *Foley,* 358 Mass. 233, 236 (1970). The objection and exception to the earlier question do not carry over to the later one to which there was no objection. *Commonwealth* v. *Domanski,* 332 Mass. 66, 77 (1954). Since the defendant made no motion to strike the answer to the question, he cannot now insist, as matter of right, that the answer was not responsive. *Commonwealth* v. *Johnson,* 199 Mass. 55, 60 (1908). *Com-*

*monwealth* v. *Welosky,* 276 Mass. 398, 417 (1931). *Commonwealth* v. *Geagan,* 339 Mass. 487, 514 (1959). *Commonwealth* v. *Early,* 349 Mass. 636, 637 (1965).

Notwithstanding the absence of any seasonable objection or exception by the defendant to the evidence in question, we nevertheless consider the issue under the mandate of G. L. c. 278, § 33E.

Moody testified in part that he had found the gun "[a]bout a month, month and a half" before October 7, 1970, that about two weeks after finding the gun he told the defendant about it, that two weeks before October 7, 1970, the defendant called him and asked if he could use the gun, that Moody told him that he could, and that the defendant did not then tell him why he wanted the gun. He also testified on direct examination and on cross-examination that he did not know why and the defendant did not tell him why he, the defendant, wanted the gun on October 7, 1970. Moody's statement, "I figured he wanted to use it," when considered in the framework of his entire testimony, and not in isolation, was not capable of being considered as a statement that the defendant ever told him that he wanted to use the gun, or as indicating that Moody had obtained such knowledge or information from any other source.

Section 33E "consigns the facts as well as the law to our consideration, gives us the power and the duty exercised by a trial judge upon a motion for a new trial, and requires us to consider the whole case broadly to determine whether there was any miscarriage of justice." *Commonwealth* v. *Cox,* 327 Mass. 609, 614 (1951). *Commonwealth* v. *Gricus,* 317 Mass. 403, 406-407 (1944). *Commonwealth* v. *Chester,* 337 Mass. 702, 713 (1958). *Commonwealth* v. *Kerrigan,* 345 Mass. 508, 510 (1963). Having thus considered the matter, we conclude that the admission of the evidence in question did not result in a miscarriage of justice, and that we are not warranted in exercising our extraordinary powers under § 33E with respect thereto.

3. *Review under G. L. c. 278, § 33E.*

We have read the entire transcript of the defendant's trial and have carefully considered the law and the evidence pertaining to the defendant's case as required by G. L. c. 278, § 33E. The jury were charged as to the offences of murder in the first degree, murder in the second degree, voluntary and involuntary manslaughter, and self-defence. There was sufficient evidence to warrant the jury in deciding that the defendant was guilty of murder in the first degree; at least one inference that the jury could draw from the evidence was that the defendant was engaged in an effort to lure and rob the customer of a prostitute when he shot Alberghini. The issue was essentially one of witness credibility, which was for the jury to determine. See *Commonwealth* v. *French,* 357 Mass. 356, 397-398 (1970). Nothing in our review of the case convinces us that the defendant is entitled to the entry of a lesser verdict and we perceive no reason for disturbing the verdict rendered by the jury.

*Judgment affirmed.*