COMMONWEALTH vs. JOHN EDWARD SATTERFIELD.

Suffolk.    May 3, 1977. — July 21, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Practice, Criminal,* Assistance of counsel, Disclosure of evidence, Probable cause hearing.    *Constitutional Law,* Assistance of counsel.

A judge did not abuse his discretion in denying a criminal defendant's motion for a new trial on the ground of ineffective assistance of counsel. [111-115]

INDICTMENT found and returned in the Superior Court on October 16, 1970.

A motion for a new trial was heard by *Leen,* J.

*Joseph A. Todisco* for the defendant.

*Robert McKenna,* Assistant District Attorney (*Edward M. Burns,* Legal Assistant to the District Attorney, & *Thomas R. Reardon,* Assistant District Attorney, with him) for the Commonwealth.

KAPLAN, J.    This is the second appearance of this case in our court. Having been convicted in Superior Court in April, 1971, of murder in the first degree (with a jury recommendation against the death penalty), the defendant Satterfield took his appeal here pursuant to G. L. c. 278, §§ 33A-33G. He contended, among other things, that he had not been properly represented by trial counsel, and included in the relief sought was a prayer for mitigation under § 33E. We affirmed the judgment and declined to act under § 33E. *Commonwealth* v. *Satterfield,* 362 Mass. 78 (1972).[1] In August, 1974, the defendant moved in the Su-

---

[1] The court dealt with contentions that the statute defining murder in the first degree, in so far as it spoke of murder "with extreme atrocity or cruelty," was unduly vague, and that there was insufficient evidence to support the verdict. As to the points about representation by counsel and mitigation under § 33E, see note 10 *infra.*

perior Court for a new trial, again raising questions about his legal representation at the trial. The judge — the same judge who had presided at the trial — took evidence and heard argument in December, 1974, and made findings on the basis of which he denied the motion in February, 1975. This is an appeal from the denial.[2]

While expressing the view that much of the new trial motion repeated matter that had been before this court on the appeal from the conviction, and had been already ruled on here, the judge undertook a reexamination of the trial transcript in connection with his appraisal of the motion. We have done the same, and reach the same negative conclusion.

First, as to the substance of the trial. Around 6 A.M., August 19, 1970, Richard Libby was killed in front of a lodging house at 617 Massachusetts Avenue, Boston, as a result of blows to his head, face, and neck, which caused a massive aspiration of blood. The principal witnesses for the prosecution were one Nick Cook, testifying as an eyewitness to the homicide; the medical examiner; a chemist, dealing with the bloodstains; and one of the police officers who first arrived on the scene. Cook said he saw the defendant stamp repeatedly with his booted feet on the victim who was lying prone on the sidewalk; at one point the defendant picked up a key ring from the sidewalk and attempted but failed to fit a key to a car parked at the curb nearby, and then returned to attack the victim again with his feet. The defendant remained near the scene and, speaking to an arriving police officer, said he had called the police thinking the victim had been hit by a car. But when

---

[2] In June, 1975, the defendant applied for habeas corpus in the United States District Court for the District of Massachusetts on grounds like those urged on the new trial motion. The application eventuated in May, 1976, in a dismissal in part, without prejudice, for failure to exhaust available State remedies. This presumably referred to the present appeal from the denial of the new trial which had been taken but not perfected. On motion, a single justice of this court allowed late perfection of the appeal.

As to a part of the habeas corpus application denied with prejudice, see note 12 *infra.*

the defendant took the stand in his own defense (he was the only defense witness), he admitted his own involvement but said that, being very drunk from intermittent drinking since the afternoon of the previous day, he had stumbled into the victim outside the lodging house, and in the altercation that followed he had kicked him defensively. The defendant's extenuating story — including his claims that he was intoxicated to the point of being incapable of deliberate premeditation, and that he acted or commenced to act in self-defense (he was twenty-eight years old, the victim fifty-seven) — emerges unimpressively from the transcript. Following instructions that put all the alternatives to the jury as to murder and manslaughter, the jury returned the verdict mentioned, which may have been based on a finding of murder "with extreme atrocity or cruelty."

Our reading of the trial transcript confirms the judge's view, expressed at the trial and again in the findings on the new trial motion, that counsel for the defendant in his general conduct of the case in court gave competent service to his client. He made a full battery of pre-trial motions. He had a command of the facts and examined the witnesses with care. His interactions with opposing counsel and the court were those of a lawyer of some experience. It may be that an examiner with the skill of a Patrick Hastings could have made better progress on cross-examination, but one concludes that the basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel.

To turn to particular criticisms, there were serious strains in the defendant's relation with counsel, and we must see whether any ground exists here for a new trial.

Just before the jury empanelment, counsel found it necessary to inform the judge that he had advised the defendant to accept a "plea bargain" of guilty of manslaughter but the defendant had refused the advice.[3] The following

---

[3] This and other such colloquies occurred out of the hearing of prospective jurors or those who served in the case.

morning, at an interval in the questioning of members of the venire, counsel said he wanted to state for the record that his client was not listening to him and was insisting that the case be conducted his way. To which the defendant answered that counsel was "mad" at him because he had not gone along with the manslaughter plea. The judge remarked that the defendant would do better to consider the advice of counsel but could insist that a given course be followed even against that advice.

Next day, after damaging direct testimony by Cook, the judge, referring to the earlier exchange, inquired whether the defendant would now prefer to question the witness himself, with counsel's assistance. The defendant said he was content to have counsel do the questioning; and the judge added that the defendant could make suggestions to counsel. By the close of the day, Cook had been cross-examined, and much of the rest of the weight of the Commonwealth's case had been put in.

By this time counsel had become so concerned about the defendant's fractiousness that he procured a psychiatric examination to be made of the defendant before the next session of court. The psychiatrist reported that the defendant remained rational and able to stand trial but wanted to "fire" his counsel.

Hearing the report, the defendant burst out with a demand for different counsel, saying that he had given names to counsel and counsel had refused to follow them up; that he didn't know who was paying counsel, and counsel said he wasn't interested in the case because he wasn't earning enough; that counsel was competent but didn't believe him and wasn't doing anything for him. Responding, counsel said in substance that he was not court-appointed but had in fact received no compensation,[4] and that he had searched for persons named by the defendant but without result. Speaking to the defendant's demand for fresh counsel, the judge said that was not feasible in midtrial. The defendant

---

[4] He mentioned the talk he had had with the judge who had presided at the probable cause hearing; see below.

could conduct the case himself, if he chose, with present counsel available for advice and assistance, or counsel could continue to lead, with the defendant making suggestions.[5]

The defense proceeded on the latter basis, and the record shows counsel conferring with the defendant many times. It seems that it was at the defendant's initiative that a view of the area at 617 Massachusetts Avenue was taken after the Commonwealth rested, and at the defendant's request the chemist was recalled and specific questions suggested by the defendant were put by counsel (against his advice) as further cross-examination. After the charge to the jury, the judge inquired of the defendant at counsel's request whether he was satisfied with the representation he had had at trial, and the answer was yes.

In the foregoing account of the trial proper, we perceive no ground, whether as to any claimed ineffectiveness of counsel or otherwise, for relieving the defendant of the judgment.[6] It may be noted that *Commonwealth* v. *Miskel*, 364 Mass. 783 (1974), which postdated our first decision in the present case, makes it quite clear that the judge was well within the range of his discretion in dealing with the exigencies of the case as he did, and particularly in refusing to allow dismissal and substitution of counsel (presumably involving a mistrial).

On the new trial motion, the defendant testified and called counsel as a witness. There was some amplification of statements made at the trial about counsel's retainer. When the judge who had presided at the probable cause hearing in the Municipal Court of the City of Boston sug-

---

[5] At this and a later stage the defendant indicated that he just wanted to get on the stand and tell his story. The judge advised him of the regular procedure and noted that he could make a statement to the jury; he did so after the closing arguments and before the judge instructed the jury.

[6] We said on the prior appeal: "The defendant's claim as to a conflict between himself and counsel as affecting the outcome of the case is not persuasive," and "[w]e have reviewed the entire evidence and are of opinion that justice does not require a new trial or the entry of a verdict of a lesser degree of guilt." 362 Mass. at 83.

gested to counsel (who had not appeared for the defendant at that hearing) that he might represent the defendant at the trial, counsel said he had been at the bar for less than ten years and thus would not qualify under Rule 95 of the Superior Court (1954) for appointment by the court to a murder case.[7] (In fact, counsel had had experience in murder trials as an assistant district attorney and on private retainer after leaving public office.) The judge said (obscurely) that something might be arranged. According to counsel, he informed the defendant after meeting him that he would require a fee, and sources of payment were discussed. No fee was billed or received. The defendant's testimony leaves the impression that he thought counsel was court-appointed. Thus the defendant might have felt constrained about discharging counsel; but it is clear that there was no trace of dissatisfaction with him until trial.[8]

Some effort was made through testimony by the defendant to show that counsel had been less than zealous in preparing the case, but it appeared that he had actually consulted many times with his client and, as indicated above, he had attempted to follow leads — indefinite ones — which for the most part, it seems, might have confirmed that the defendant had been drinking before the homicide. (But police officers said the defendant was not drunk around the time of his arrest, which occurred on the scene shortly after the homicide on the strength of Cook's account to the police of what he had seen.) In cross-examining Cook at trial, counsel brought out that Cook had observed a Chinese couple coming out of a nearby building about the time of the homicide, going past the defendant,

---

[7] Rule 95 has become Rule 53 (1976), as amended, with changed requirements.

[8] The findings refer to a contention that when the defendant indicated to the trial judge he wanted to fire counsel, and the judge refused to allow it, counsel reverted to the status of a court appointed counsel who, as it then happened, could not satisfy Rule 95. We agree this was mere word play, and need not answer the question what is the consequence of noncompliance with that rule.

Commonwealth *v.* Satterfield.

and entering a taxicab which drove away; Cook mentioned also a white man who emerged from a building onto the scene and then retreated. (None of this had been communicated to counsel by the defendant.) The officer in charge of the case testified that a Chinese couple was found, but disclaimed having seen anything; neither the taxicab driver nor the white man could be found; and inquiries at nearby buildings for witnesses were fruitless.[9] There was argument that counsel should have protested the Commonwealth's omission to give notice of the four possible witnesses as a violation of a pre-trial order requiring the Commonwealth to disclose exculpatory evidence, or that counsel should have demanded an opportunity to seek out and interrogate the Chinese couple (which might have required a mistrial). But the "evidence" was, after all, empty rather than exculpatory, and if pursued would in all probability have led to the same dead end testified to by the police. See *Commonwealth* v. *Pisa,* 372 Mass. 590, 593-597 (1977); *United States* v. *Agurs,* 427 U.S. 97 (1976).

We should recall that in a case where ineffective assistance of counsel is charged, there ought to be some showing that better work might have accomplished something material for the defense.[10] An exception might be indulged where the defense was so botched that judgments on that hypothetical question would be without value. That is not the present case.

Lastly, it is argued that the conviction should be va-

---

[9] We are not impressed with the suggestion that the defendant was materially prejudiced by the prosecutor's remark in his closing speech that no one wanted to come forward.

[10] "[W]hat is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

cated because the probable cause hearing preceding the indictment consisted merely of the testimony of three Commonwealth witnesses, and assigned counsel had had no more than a ten-minute conference with the defendant. Without condoning such meager preparation,[11] we have to point out that this occurred before the reformulation of the character of probable cause hearings by *Myers* v. *Commonwealth*, 363 Mass. 843 (1973) (a decision without retroactive effect, see at 856 n.14); that, even now, it is sound strategy in given circumstances for a defendant to forgo cross-examining Commonwealth witnesses offered at the hearing; and that it would be hard to trace any inadequacy at the hearing into the trial so as to justify a new trial.[12]

The judge's denial of a new trial lay within his sound discretion. *Commonwealth* v. *Devereaux*, 257 Mass. 391, 394 (1926).

*Order affirmed.*

---

[11] See *Commonwealth* v. *Saferian, supra* at 97.

[12] The judge who heard the application for Federal habeas corpus denied on the merits so much of the application as claimed that the petitioner's rights were violated at the probable cause hearing. Cf. *Commonwealth* v. *Britt*, 362 Mass. 325, 330 (1972).