## COMMONWEALTH *vs.* GREGORY DIATCHENKO.

Suffolk.    October 6, 1982. — December 8, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & NOLAN, JJ.

*Constitutional Law,* Cruel and unusual punishment, Assistance of counsel. *Homicide. Practice, Criminal,* Continuance, Assistance of counsel, Instructions to jury.

The mandatory term of life imprisonment for murder in the first degree required by G. L. c. 265, § 2, does not constitute either cruel and unusual punishment under the United States Constitution or cruel or unusual punishment under the Massachusetts Declaration of Rights. [721-727]

Refusal by the judge at a murder trial to grant a continuance of thirty days after empanelment of the jury in order to allow the defendant to change counsel did not constitute a denial of the effective assistance of counsel. [727-728]

There was no merit to a defendant's contention that the judge's instructions to the jury in a murder trial were confusing, misleading and constituted reversible error. [728-729]

INDICTMENT found and returned in the Superior Court Department on June 12, 1981.

The case was tried before *Brogna,* J.

*J. Albert Johnson (Thomas J. May* with him) for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney (*John Richard,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.   The defendant, Gregory Diatchenko, was convicted of murder in the first degree by a jury in the Superior Court in Suffolk County and sentenced, pursuant to G. L. c. 265, § 2, to the mandatory term of life imprisonment without the possibility of parole.   On appeal, the defendant contends that G. L. c. 265, § 2, is unconstitutional

under the United States and Massachusetts Constitutions, because it requires a mandatory term of life imprisonment without the possibility of parole and does not allow the trial judge to consider mitigating factors prior to sentencing. He also argues that the trial judge's refusal to grant the defendant's request to change counsel was unconstitutional because it denied him the right to effective assistance of counsel. The defendant's final assertion is that the judge's instructions to the jury were confusing and misleading and that the judgment should be reversed because the alleged errors in the instructions resulted in the defendant's being improperly convicted of murder in the first degree. We disagree with all the defendant's arguments and, therefore, affirm the judgment.

On the evening of May 9, 1981, at approximately 9:45 P.M., Boston police Officer Peter Jerome received a radio call directing him to an alley at the rear of 860 Beacon Street, near Kenmore Square. When he arrived he saw the victim, Thomas Wharf, slumped unconscious and bleeding in the driver's seat of a red Cadillac automobile. Wharf was pronounced dead at 10:40 P.M. An autopsy revealed nine stab wounds, including one penetrating the left lung at a depth of four inches and another piercing the heart at a depth of seven inches. The right rear pocket of the victim's pants had been ripped open.

The Commonwealth presented extensive evidence indicating that the defendant committed the murder. Ronald Gray testified that he saw the defendant alone on Hadassah Way near Park Square in Boston on the night of the stabbing at approximately 8 P.M. Lori Pearlman testified that she was seated at a table in the living room of her apartment at 860 Beacon Street on the night of the stabbing. The table was located next to an open window overlooking the alley where the stabbing occurred. At approximately 9:30 P.M., she heard a loud voice from the alley yell out a few times, "Give me your money, you m---f---." She telephoned the police and reported what she assumed was a robbery. While she was on the telephone, she heard a car horn sound con-

tinuously for approximately five seconds. She next saw someone with blond or light brown hair, wearing a brown leather jacket, run away from the building past parked cars in the alley.

On the same night, at approximately 10:15 P.M., James Ryan was seated at a shelter at the Brookline Village street-car station. He saw a light-haired young man, carrying a brown leather jacket, walk along the trolley tracks, coming from the direction of the scene of the murder. The young man came into the shelter, sat down beside Ryan, and asked him for a match. Ryan, who noticed that the young man's hand was covered with blood, asked him if he had cut himself. The young man replied that he had been in a fight and had stabbed someone approximately twenty times. Ryan and the young man spoke for about fifteen minutes and the young man told Ryan that his name was Greg. On the following day, Sunday, May 10, Ryan read an account of the murder in a newspaper. On Monday, May 11, Ryan telephoned the Boston police and told them of his meeting with the young man on the night of the stabbing. Ryan later identified a photograph of the defendant from an array of eleven photographs. The defendant's fingerprints were found in and on the victim's car.

An arrest warrant was issued for the defendant. A search of the defendant's apartment was conducted during the arrest, and a brown leather jacket and a knife were found.

At his trial, the defendant was represented by a privately retained attorney, Mr. William Homans. After the start but before the completion of the empanelling of the jury, the defendant advised the judge that he wished to speak with another attorney. The defendant indicated that he had consulted with another attorney, Mr. Albert Johnson, and asked the judge for "a little more time so [he] could talk to this attorney to see what he has to say." Since the request was made during the empanelling of the jury, the judge stated that he would not stop the trial but that the defendant could confer with Mr. Johnson when the empanelling was completed.

The following day, in a lobby conference, the defendant expressed his wish to change counsel, and the judge discussed the request with Mr. Homans, with the prosecutor, and with a Mr. Thomas May, who is an associate of Mr. Johnson. Mr. May explained that the defendant did not have "any specific complaint, but just a general feeling of discomfort and lack of confidence." Mr. May also stated that he would need a continuance of at least thirty days in order to prepare adequately for trial. The prosecutor pointed out that the Commonwealth had flown the main witness to Boston from North Carolina and that arrangements had been made to bring the second most important witness down from Maine for the trial. Also, the jury had been empanelled and a bus and police cruiser were outside waiting to take the jury on a view of the scene of the murder. The judge decided that the trial should not be delayed unnecessarily and that Mr. Homans should continue as defense counsel.

The jury returned a verdict of guilty of murder in the first degree. The jurors' answers to special questions revealed that they found deliberate premeditation and malice aforethought, extreme atrocity and cruelty, and felony-murder (armed robbery). Defense counsel attempted to introduce mitigating factors at the sentencing phase of the trial but the judge refused to consider them. The judge imposed the punishment required under G. L. c. 265, § 2, life imprisonment without the possibility of parole.

1. The defendant maintains that the mandatory sentencing provision[1] of G. L. c. 265, § 2, is constitutionally infirm as cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution

---

[1] We point out that G. L. c. 265, § 2, provides that the Governor may commute a defendant's sentence thereby subjecting the defendant to statutory provisions allowing parole. See G. L. c. 127, § 152. Furthermore, we are empowered to reduce a verdict against a defendant pursuant to our obligation of review under G. L. c. 278, § 33E. Thus, to this limited extent the mandatory sentence of life imprisonment without the possibility of parole is not absolute.

and cruel or unusual punishment under art. 26 of the Massachusetts Declaration of Rights[2] because it contravenes modern standards of decency and because the punishment imposed is so disproportionate to the offense. We disagree.

The defendant's first attack on the constitutional validity of G. L. c. 265, § 2, focuses on the statute's mandatory and nondiscretionary character. The defendant suggests that, because in other circumstances the Legislature frequently has allowed the exercise of judicial discretion in sentencing, that practice has become a contemporary standard of decency. He then concludes that a statute that does not comport with contemporary standards of decency is unconstitutional. The cases cited by the defendant, however, examine only the constitutionality of death penalty provisions. See *Eddings* v. *Oklahoma,* 455 U.S. 104 (1982); *District Attorney for the Suffolk Dist.* v. *Watson,* 381 Mass. 648 (1980). Since these cases involve the death penalty, they are of limited usefulness in assessing the constitutionality of a mandatory term of life imprisonment. In *Lockett* v. *Ohio,* 438 U.S. 586, 605 (1978), a plurality of the Supreme Court stated, "Given that the imposition of death by public authority *is so profoundly different from all other penalties,* we cannot avoid the conclusion that an individualized decision is essential in capital cases" (emphasis supplied).[3] In

---

[2] We have never decided whether the language of the Eighth Amendment ("nor cruel and unusual punishments inflicted") and art. 26 ("[n]o magistrate or court of law, shall . . . inflict cruel or unusual punishments") imports the same meaning. *Cepulonis* v. *Commonwealth,* 384 Mass. 495, 496 n.2 (1981), appeal dismissed, 455 U.S. 931 (1982). *District Attorney for the Suffolk Dist.* v. *Watson,* 381 Mass. 648, 676 (1980) (Liacos, J., concurring). We need not decide the issue here. See *Cepulonis, supra* at 496 n.2.

[3] General Laws c. 278, § 33E, as appearing in St. 1979, c. 346, § 2, defines a capital case as one "in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder in the first degree." Section 33E, however, also provides that such a case is a capital case only for determining the availability of plenary review by this court under that section. Therefore, a capital case as defined under c. 278, § 33E, is *not* the same type of capital case referred to by the Supreme Court in *Lockett* v. *Ohio,* 438 U.S. 586 (1978), and other cases. The Supreme

*Lockett* and in cases decided after it, the Supreme Court has reiterated that the standard for evaluating the constitutionality of death penalty provisions is much higher than the standard to be employed in evaluating other penalties. See, e.g., *id.* at 605 n.13 ("Sentencing in noncapital cases presents no comparable problems"); *Rummel* v. *Estelle,* 445 U.S. 263, 272 (1980) ("Because a sentence of death differs in kind from any sentence of imprisonment, *no matter how long,* our decisions [in death penalty cases] are of limited assistance in deciding the constitutionality of [other] punishment . . ." [emphasis supplied]). See also *District Attorney for the Suffolk Dist.* v. *Watson,* 381 Mass. 648, 664 (1980) ("[T]he death penalty is unacceptable under contemporary standards of decency in its *unique* and inherent capacity to inflict pain" [emphasis supplied]). The Supreme Court has even stated that, although discretionary sentencing is an accepted practice, it is not constitutionally required in cases not involving the death penalty. *Lockett, supra* at 602, 604-605 (plurality opinion). *Woodson* v. *North Carolina,* 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell and Stevens, JJ.). Cf. *Eddings* v. *Oklahoma,* 455 U.S. 104 (1982) (consideration of sixteen year old defendant's family history required because death penalty was involved). Therefore, we reject the defendant's argument that G. L. c. 265, § 2, is unconstitutional because it does not allow consideration of mitigating circumstances.

The defendant's second challenge to the validity of G. L. c. 265, § 2, is that the punishment imposed is so disproportionate to the crime committed by the defendant as to constitute cruel and unusual punishment. We conclude, however, that the mandatory term of life imprisonment imposed in this case does not constitute cruel and unusual punishment under the Federal and State Constitutions. Decisions in this State, other States,[4] and the Supreme Court have

---

Court obviously intended to refer only to those cases where imposition of the death penalty was possible.

[4] An overwhelming number of courts have concluded that a term of life imprisonment without the possibility of parole is not cruel and unusual

upheld prison sentences equal in severity to the sentence imposed in this case. For example, in *Rummel v. Estelle*, 445 U.S. 263, 266, 285 (1980), the Supreme Court held that a mandatory life sentence imposed under a Texas recidivist statute following the defendant's third felony conviction (obtaining $120.75 by false pretenses) did not constitute cruel and unusual punishment. The Court reasoned that

---

punishment. See, e.g., *Government of V. I.* v. *Gereau*, 592 F.2d 192, 195 (3d Cir. 1979) (first degree murder); *McGinnis* v. *State*, 382 So. 2d 605, 608 (Ala. Crim. App. 1979) (nighttime burglary and intentional killing); *State* v. *Parle*, 110 Ariz. 517, 521, cert. denied, 419 U.S. 1003 (1974) (first degree murder — parole left to discretion of Governor on recommendation of parole board); *State* v. *Taylor*, 82 Ariz. 289, 294 (1957) (kidnapping); *Dyas* v. *State*, 260 Ark. 303, 324 (1976) (capital felony-murder); *Rogers* v. *State*, 257 Ark. 144, 155-157 (1974), cert. denied, 421 U.S. 930 (1975) (first degree rape — defendant was seventeen year old first-time offender); *Matter of Rosencrantz*, 205 Cal. 534, 537 (1928) (recidivist statute); *People* v. *Isitt*, 55 Cal. App. 3d 23, 32-33 (1976) (kidnapping for robbery with bodily harm — imposed on seventeen year old); *State* v. *Spence*, 367 A.2d 983, 989 (Del. 1976) (first degree murder — imposed on youth); *McDonald* v. *Commonwealth*, 569 S.W.2d 134, 138 (Ky. 1978), cert. denied, 439 U.S. 1119 (1979) (rape); *State* v. *Hartman*, 388 So. 2d 688, 695 (La. 1980) (first degree murder); *State* v. *Brooks*, 350 So. 2d 1174, 1175-1176 (La. 1977) (second degree murder — no parole for forty years); *People* v. *Hall*, 396 Mich. 650, 658 (1976) (felony-murder); *State* v. *Borden*, 605 S.W.2d 88, 92-93 (Mo. 1980) (capital murder — no parole for fifty years); *State* v. *Farrow*, 118 N.H. 296, 304 (1978) (first degree murder); *State* v. *Forrester*, 21 Wash. App. 855, 868-871 (1978) (aggravated first degree murder — imposed on youth). See also Annot., 100 A.L.R.3d 431 (1980); Annot., 33 A.L.R.3d 335 (1970). We are aware of only one case where a court has declared a mandatory term of life imprisonment without the possibility of parole unconstitutional. *Workman* v. *Commonwealth*, 429 S.W.2d 374, 378 (Ky. 1968). In *Workman*, the court held unconstitutional a sentence of life imprisonment without the benefit of parole imposed on two fourteen year old youths who were convicted of forcible rape. We decline, however, to follow *Workman* in this case. *Helm* v. *Solem*, 684 F.2d 582 (8th Cir. 1982), cert. granted, 459 U.S. 986 (1982), did not involve a mandatory term of life imprisonment. *Id.* at 583. The court in *Helm* held, however, that the imposition of a term of life imprisonment without the possibility of parole was unconstitutional where the sentence was imposed on a habitual offender who had an alcohol problem and who had committed no crimes of violence. *Id.* at 586-587. We note only that the crime committed in this case did involve substantial violence and *Helm*, therefore, is inapplicable.

"[o]utside the context of [the death penalty], successful challenges to the proportionality of particular sentences have been exceedingly rare." *Id.* at 272. Indeed, the Court indicated that for crimes "punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative" (footnote omitted). *Id.* at 274.

Our decisions also indicate that the mandatory sentence involved in this case is not cruel and unusual punishment. We have used a tripartite test in evaluating whether a defendant has met his burden of proving that a punishment is "so disproportionate to the crime that 'it shocks the conscience and offends fundamental notions of human dignity.'" *Commonwealth* v. *Jackson,* 369 Mass. 904, 910 (1976), quoting *In re Lynch,* 8 Cal. 3d 410, 424 (1972). See also *Cepulonis* v. *Commonwealth,* 384 Mass. 495, 496-497 (1981), appeal dismissed, 455 U.S. 931 (1982). The first prong of that test examines "the nature of the offense and the offender in light of the degree of harm to society." *Jackson, supra.* As the defendant concedes, he was convicted of the most severe crime possible in this Commonwealth, murder committed with deliberate premeditation, with extreme atrocity or cruelty, and during the commission of a felony. He argues, however, that he was so convicted when he was a minor and that he had a troubled adolescence which resulted in emotional and mental disturbances. The defendant concludes that because G. L. c. 265, § 2, precludes consideration of these mitigating factors, he has satisfied the first prong of the tripartite test. We do not agree. The Legislature may determine that a severe penalty is needed to protect the public from those who would commit murder in the first degree. Even though the defendant is young, that fact alone does not justify invalidating the Legislature's choice of punishment for murder in the first degree. See *People* v. *Williams,* 100 Misc. 2d 183, 187 (N.Y. Dutchess Cty. Ct. 1979) ("[T]here is no constitutional right to youthful offender treatment . . .").

The second prong of the disproportionality test involves a comparison between the sentence imposed in this case and punishment for the commission of more serious crimes in the Commonwealth. *Cepulonis, supra* at 497. This prong cannot even be applied in this case because there are no crimes more serious than that committed by the defendant.

Under the final prong of the disproportionality test, we must compare the penalty challenged here with penalties prescribed for the same offense in other jurisdictions. *Cepulonis, supra.* The defendant refers us only to a decision in California where, he asserts, the California Supreme Court vacated as unconstitutional the imposition of a sentence of life imprisonment without the possibility of parole upon a sixteen year old boy convicted of the murder of a thirteen year old girl during the commission of a rape. See *People* v. *Davis,* 29 Cal. 3d 814 (1981). The defendant, however, misstates the court's holding in *Davis.* The court did not intimate its views as to the constitutionality of the punishment imposed in that case. Rather, the court determined that the statute setting out the penalties for first degree murder was "equivocal" as to whether its provision regarding life imprisonment without the possibility of parole applied to minors. *Id.* at 827-828. Therefore, the court determined that any "ambiguity must be resolved in defendant's favor" by concluding that the provision authorizing a sentence of life imprisonment without parole does not apply to minors. *Id.* at 832. Hence, the defendant has not satisfied his burden of demonstrating that the mandatory term of life imprisonment without the possibility of parole is so disproportionate to penalties imposed in other States for the same crime that art. 26 or the Eighth Amendment is violated.

The defendant's final contention with regard to G. L. c. 265, § 2, is that the sentence imposed is excessive and, therefore, unconstitutional because it makes no measurable contribution to acceptable goals of punishment and is no more than a needless imposition of pain and suffering. We have identified the following interests that may be served by punishment: "(1) deterrence, (2) isolation and incapacita-

tion, (3) retribution and moral reinforcement, and (4) reformation." *Cepulonis, supra* at 499. The standard of review in considering a sentence other than the death penalty is "whether the statute bears a reasonable relation to a permissible legislative objective." *Id.,* quoting *Commonwealth* v. *Jackson,* 369 Mass. 904, 918 (1976). We cannot conclude, nor does the defendant demonstrate, that G. L. c. 265, § 2, bears no relation to *any* acceptable goals of punishment. Compare *Cepulonis, supra* at 499 (a sentence of forty to fifty years for unlawful possession of a machine gun where the defendant used the gun for felonious purposes is not unconstitutional).

2. The defendant also argues that the judge's refusal to grant a thirty-day continuance to allow him to substitute counsel was unconstitutional in that it was equivalent to a denial of the effective assistance of counsel. We disagree. The first indication that the defendant may have desired to change counsel did not occur until the empanelling of the jury had begun. His formal request was not made until after the empanelment was completed and the jury were preparing to go for a view of the scene of the murder. We have emphasized that "a defendant's freedom to change his counsel is restricted on the commencement of trial." *Commonwealth* v. *Miskel,* 364 Mass. 783, 791 (1974). In *Miskel,* we determined that a request made after the commencement of empanelment of the jury may be treated as a request made after the commencement of trial. *Id.* The standard to be applied by the trial judge when a request is made after the commencement of trial is one of balancing any prejudice to the defendant's interests with the foreseeable effect on the trial already in progress. *Id.* The resolution of this balancing test "must be largely within the discretion of the trial judge." *Id.,* quoting *Lamoreux* v. *Commonwealth,* 353 Mass. 556, 560 (1968). The defendant in this case asked to interrupt the trial for at least thirty days, at great expense and inconvenience to the Commonwealth and the witnesses. He sought to dismiss an attorney he had retained privately six months before the trial and

with whom he did not have "any specific complaint, but just a general feeling of discomfort and lack of confidence." There is no showing, moreover, that the attorney performed in other than competent, efficient, and attentive fashion. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). In light of these considerations, we conclude that the judge did not abuse his discretion in this case.

3. The defendant's final contention, that the judge's instructions to the jury were confusing, misleading, and constituted reversible error, is also without merit. A reading of the instructions as a whole reveals a thoroughly even-handed charge. The defendant relies heavily on a statement made by the judge out of the hearing of the jury. The judge stated, "Under my instructions, there will be no manslaughter if they follow it." The instruction given to the jury regarding manslaughter, however, reveals a fair treatment of that degree of homicide: "Notice, I told you that it is your function to determine whether there was a killing with malice aforethought or not. . . . [O]f course, it's up to you as to whether you believe it or not . . . . [T]he Commonwealth . . . has to convince you that regardless of whether there was a fight or not, the defendant, if he stabbed Mr. Wharf, acted with malice aforethought. . . . But that would be up to you. And I still repeat that you are to decide the case . . . ." The defendant also contends that the jury's requested clarification concerning the verdict is sufficient proof that the instructions were so confusing as to constitute reversible error. In support of his argument that the instructions were confusing and misleading, the defendant quotes the following passage from the instructions: "Now, as I pointed out to you before, the law says that the jury find the degree of murder; but I also wish to point out to you that you are bound by your oath, if you are convinced that it was a murder, that Mr. Diatchenko murdered Mr. Wharf, you are bound by your oath to bring in the highest degree of murder of which you are convinced he is guilty beyond a reasonable doubt." Contrary to the defendant's assertion, this excerpt is a correct and commend-

able restatement of the jury instruction that we suggested in *Commonwealth* v. *Dickerson*, 372 Mass. 783, 798 n.6 (1977). Accordingly, we conclude that the judge's instructions contain no error.

Finally, we have carefully examined the record as we are required to do under G. L. c. 278, § 33E. We decline to revise the jury verdict of guilty of murder in the first degree.

*Judgment affirmed.*